OPINION
{¶ 1} Appellant, Cary H. Schultz ("Schultz") appeals his conviction on one count of promoting prostitution, a felony of the fourth degree in violation of R.C. 2907.22(A)(2), and one count of possessing criminal tools, a felony of the fifth degree, in violation of R.C. 2923.24, following a bench trial in the Lake County Court of Common Pleas. Schultz was sentenced to serve a stated prison term of seventeen months for promoting prostitution and of six months for possessing criminal tools, to be served concurrently, at the Lorain Correctional Institution, Grafton, Ohio. For the following reasons, we affirm the decision of the trial court.
 {¶ 2} Shortly before midnight on August 19, 2002, Patrolman James Davis ("Davis") of the Willoughby Police Department was on routine patrol when he observed Schultz operating a blue Ford Tempo without headlights in the parking lot of the Red Roof Inn on State Route 306 in Willoughby. Davis observed Schultz exit southbound on Route 306, turn around in the parking lot of a Marathon gas station, and then proceed northbound without activating the headlights. As Schultz approached the entrance ramp for Interstate 90, Davis stopped Schultz's vehicle. Davis asked Schultz for identification and asked him whence he was coming. Schultz informed Davis that he has just dropped a friend off at the Red Roof Inn. Schultz's information was run though the LEADS system, which reported that Schultz's driving privileges had been revoked for a non-compliance FRA suspension. During this time, Sergeant Randy Sevel ("Sevel") and Patrolman David Burrington ("Burrington") of the Willoughby Police Department also arrived on the scene. Davis placed Schultz under arrest for driving with a suspended license, failure to wear a seatbelt, and driving without headlights.
 {¶ 3} Davis and Barrington ordered a tow truck and inventoried Schultz's automobile. Davis observed that Schultz had two cell phones in his shirt pocket. While waiting for the tow truck, one of Schultz's phones rang approximately three times. Davis did not permit Schultz to answer the phone, however, Davis observed that the caller ID screen identified the caller as "Desiray." The search of Schultz's vehicle produced the following items that were seized by the police: a third cell phone; a stack of business cards advertising "Affordable Attractive 24 Hour Playmates"; unused condoms and a syringe; a notebook containing a list of female names, their physical descriptions and their ages; a list of mostly male names and phone numbers; a small book with various addresses and the notation "# 135" on it. The business cards carried two phone numbers, 216-741-4500 and 216-351-5757. Burrington requested the dispatcher to call one of the numbers, 216-741-4500, listed on the business cards. The call from the dispatcher was received on one of Schultz's cell phones. The caller ID displayed the number of the Willoughby Police Department. Burrington answered the phone and confirmed that it was the dispatcher calling.
 {¶ 4} Sevel ordered surveillance to be set up on Room 135 of the Red Roof Inn. At approximately 2:30 a.m., August 20, officers observed an Americab mini-van arrive at the hotel and a female, Desiray King ("King"), emerge from Room 135 and enter the cab. Officers stopped the cab and arrested King. From King's purse, police recovered an "Affordable Attractive 24 Hour Playmates" business card and one hundred and sixty dollars in twenty dollar bills. Both Sevel and Burrington would later testify that King was lucid and coherent when arrested and did not appear to be under the influence of drugs or alcohol.
 {¶ 5} Later that morning, King signed a statement at the police station implicating Schultz in promoting prostitution. According to the statement, King was doing heroin when Schultz called her about a "deal" for "a guy named Bill Johnson from the Red Roof Motel in Willoughby [who] wanted full service (to have sex)." King explained that she would get $80.00 and Schultz would get $60.00. King also wrote in her statement that she had been working for Schultz for about a month, that she typically worked two to three jobs a day, and that Schultz told her the customers normally wanted sex and/or massages.
 {¶ 6} Schultz subsequently filed a motion to suppress, challenging the stop and search of his vehicle. Following a hearing, the trial court denied Schultz's motion on April 16, 2003.
 {¶ 7} On July 28, 2003, the State filed a motion to have King declared an unavailable witness pursuant to Evid. R. 804. Schultz's trial began on July 29, 2003. The court began by conducting a voire dire examination of the Lake County Prosecutor's Office Chief Investigator, Thomas Walsh ("Walsh"), to determine whether the State had made reasonable efforts to procure her attendance. At this time, Schultz requested a continuance to secure King's presence. The trial court granted the request, but heard the testimony of the State's witness, William Johnson ("Johnson"), who lives in the Cincinnati area.
 {¶ 8} Johnson, the guest registered in Room 135 of the Red Roof Inn on the evening that Schultz was arrested, testified that on the evening of August 19, 2002, between 10:30 and 11:00 p.m., he made several calls to numbers found in the Cleveland yellow pages in an effort to obtain the services of an "escort." One of the numbers Johnson dialed was 216-351-5757 for "Low Cost Attractive 24 Hour Playmates." Another number was 216-741-4500 for "Reliable Rabbits of Cleveland." The numbers Johnson called were the same numbers as those on the business cards seized from Schultz and King. Johnson testified that he heard the same man's voice answer the phone for both numbers. Johnson arranged to have a girl sent to his room for $155.00.
 {¶ 9} At around midnight, Schultz dropped King off at Johnson's room. King informed Johnson that it would cost $150 for her to stay there for an hour. Johnson gave King $160 in twenty dollar bills and, in return, King performed oral sex on Johnson. Thereupon, between 12:30 and 12:45 a.m., King attempted to call her ride to pick her up. Johnson testified that King then went into a "panic mode" and became very upset and agitated. She placed another phone call during which Johnson overheard King say, "Girlfriend, I think they got him. Cary, I think they got him." After that, King asked Johnson for a ride. Instead, Johnson arranged for a cab to come and pick up King.
 {¶ 10} Schultz's trial resumed on July 31, 2003, with King testifying, over Schultz's objection, as the court's witness. King testified that the business "Affordable Attractive 24 Hour Playmates" was owned by a friend of hers named "Steve." King testified that it was Steve who received the phone calls from Johnson and that the deal was with Johnson for a "massage." According to King, Schultz's only role in the business was that of a driver. King testified that her name and physical description were contained in one of the notebooks taken from Schultz's vehicle. King's account of the encounter with Johnson in Room 135 largely corroborated the account given by Johnson. King stated that she asked Johnson what he wanted to do when she arrived at the room and that Johnson replied that if she were not going to give him sex, then he did not want her. King testified that the idea of having sex was Johnson's idea and that she agreed in order to support her heroin habit.
 {¶ 11} King disputed the veracity of the written statement she made for the police. King testified that she substituted Schultz's name for Steve's name in the statement because the police had told her that Schultz was saying bad things about her. King also claimed that when she wrote her statement she was under the influence of drugs and that she was intimidated by the police. King explained that she would give Steve's share of the money to Schultz because Steve knew she would spend it on drugs.
 {¶ 12} Following the trial, the trial court found Schultz guilty of promoting prostitution and possession of criminal tools. This appeal timely follows.
 {¶ 13} Schultz raises the following assignments of error:
 {¶ 14} "[1.] The court committed prejudicial error in denying defendant due process of law when it overruled defendant's motion to suppress.
 {¶ 15} "[2.] Defendant was denied due process of law and his right of confrontation and cross-examination when the court admitted Desiray King's statement to the police.
 {¶ 16} "[3.] Defendant was denied due process of law when the court allowed the prosecution to call Desiray King as a court's witness.
 {¶ 17} "[4.] Defendant was denied due process of law when the court overruled his motion for judgment of acquittal as there was insufficient evidence to permit a rational factfinder to return verdict of guilty."
 {¶ 18} Schultz's first assignment of error challenges the trial court's denial of his motion to suppress. At a suppression hearing, the trial court acts as the trier of fact. Ravenna v.Nethken, 2001-P-0040, 2002-Ohio-3129, at ¶ 13, citing State v.Mills (1992), 62 Ohio St.3d 357, 366. As the trier of fact, the trial court must evaluate the evidence and judge the credibility of the witnesses. Mills, 62 Ohio St.3d at 366, citing State v.Fanning (1982), 1 Ohio St.3d 19, 20. "The court of appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence." State v. Searls (1997),118 Ohio App.3d 739, 741. Accepting the trial court's determination of the factual issues, the court of appeals must conduct a de novo review of the trial court's application of the law to those facts. Id.; State v. Stiles, 11th Dist. No. 2002-A-0078, 2003-Ohio-5535, at ¶ 11.
 {¶ 19} The Fourth Amendment to the United States Constitution
provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It is well-settled under federal and state law that administrative inventory searches performed according to established procedures are not unreasonable. SouthDakota v. Opperman (1976), 428 U.S. 364, 372. The United States Supreme Court "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." Id. at 373. Therefore, "a routine inventory search of a lawfully impounded automobile is not unreasonable within the meaning of the Fourth Amendment when performed pursuant to standard police practice, and when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded automobile." State v.Robison (1979), 58 Ohio St.2d 478, 480.
 {¶ 20} Under this assignment of error, Schultz argues that the trial court failed to consider the "full scope" of his motion to suppress. While the trial court considered the legality of the initial stop and arrest of Schultz, it failed to consider whether the police exceeded the scope of the inventory search of Schultz's vehicle. Schultz argues that none of the items seized from his vehicle, such as the business cards and the address books, were immediately incriminating or illegal. Therefore, the police were not justified in conducting further investigation of Schultz by having the dispatcher call the number printed on the business card.
 {¶ 21} At the suppression hearing, Patrolman Davis testified that he determined to have Schultz's vehicle towed because Schultz would not be able to continue driving with his license under suspension.[1] It is the departmental policy of the Willoughby Police Department to inventory vehicles for valuables at the scene, before the vehicles are taken to the tow yard. Specifically, the police are supposed to indicate on the tow slip anything of value, such as money, expensive tools, or electronics. Normally, these items are left with the vehicle. The "vehicle inventory" on the tow slip for Schultz's Ford indicates a battery, spare tire, and an AM-FM radio, but nothing else of value. Davis testified that Schultz's cell phone was not listed on the tow slip because it was taken out of the car by the police as "possible evidence" in their investigation of Schultz. Davis also testified that the other items taken from the car, such as the business cards and notebooks, were seized in furtherance of a police investigation.
 {¶ 22} Inventory searches allow police to search a vehicle for a limited purpose, in this case to catalogue items of value left in the vehicle. Cf. State v. Rose (1997),118 Ohio App.3d 864, 869-870 (police exceeded scope of inventory search "to preserve and document the car's contents" by searching the vehicle's air vents for contraband). This limited right to search does not allow the police to indiscriminately seize an item merely because they discovered it during an otherwise valid search of the vehicle. Contraband, such as drugs or weapons, may be immediately seized during an inventory search because their discovery implicates the plain view doctrine. Under the plain view doctrine, an item may be seized if its incriminating character is immediately apparent and the officers have a lawful right of access or control over the item. State v. Kinley
(1995), 72 Ohio St.3d 491, 495; State v. Waddy (1992),63 Ohio St.3d 424, 442. An inventory search provides for an officer's lawful right of access to an item, it does not obviate the "immediately apparent" requirement, i.e. that the officer have probable cause to associate the item with criminal activity.State v. Halczyszak (1986), 25 Ohio St.3d 301, paragraph three of the syllabus.
 {¶ 23} We hold that Davis exceeded the permissible scope of the inventory search by seizing items that were not immediately incriminating of further criminal activity. The limited purpose of the search was to inventory valuables. The only item seized from Schultz' vehicle that was considered a valuable by Willoughby police was the cell phone found on the visor. This item was not inventoried, however, because it was seized and taken to the police station. Davis admitted that the items found in the car did not create probable cause that Schultz was engaged in further criminal activity and that the sole purpose of seizing these items was investigatory. Inventory searches must be conducted in good faith and not, as was done in this case, "as ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells (1990), 495 U.S. 1, 4; State v.Caponi (1984), 12 Ohio St.3d 302, at syllabus ("A search which is conducted with an investigatory intent, and which is not conducted in the manner of an inventory search, does not constitute an `inventory search' and may not be used as a pretext to conduct a warrantless evidentiary search.").
 {¶ 24} The State's failure to prove that the items were properly seized during an inventory search of Schultz's vehicle is not dispositive of this assignment of error. We must also determine whether the seizure was justified under any other exception to the Fourth Amendment's reasonableness requirement. In this case, we find that all the items seized from Schultz's person and vehicle were properly seized as part of a valid search incident to an arrest. Cf. United States v. Byrd (Feb. 21, 1995), 6th Cir. No. 94-5301, 1995 U.S. App. LEXIS 3592, at *16-*21 (holding that the search of defendant's car was a valid search incident to arrest although the district erred in finding that the warrantless search of defendant's automobile was a valid inventory search); United States v. Patterson (C.A.6 1993),993 F.2d 121, 122-123; State v. Clancy, 2nd Dist. No. 18844, 2002-Ohio-1881, at ¶¶ 42-47.
 {¶ 25} Pursuant to a search incident to an arrest, "[w]hen a police officer has made a lawful custodial arrest of the occupant of an automobile, the officer may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." State v. Murrell, 94 Ohio St.3d 489,2002-Ohio-1483, at syllabus, following New York v. Belton
(1981), 453 U.S. 454. A search incident to an arrest is broader in scope than an inventory search. "The authority to search * * * incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon * * * the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under theFourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." Belton,453 U.S. at 461, quoting United States v. Robinson (1973), 414 U.S. 218,235.[2]
 {¶ 26} In the present case, the pertinent items seized were two cell phones from Schultz's person, one cell phone from the visor of Schultz's vehicle, business cards from the driver's side door, and notebooks from the passenger's seat. Prior to seizing these items, the police had determined to arrest Schultz for driving with a suspended license. Since Davis made a lawful custodial arrest of Schultz, Willoughby police were entitled to search and seize the items taken from Schultz's person and his automobile. Thereafter, the police were entitled to further their investigation by having the dispatcher call the phone numbers printed on the business cards and by setting up surveillance of Room 135. Schultz's first assignment of error is overruled.
 {¶ 27} Under the third assignment of error, Schultz argues that the trial court abused its discretion by allowing King to testify as the court's witness. According to Schultz, "there must be some advance knowledge by the prosecutor either through obtaining inconsistent statements or through an interview with a witness in which the witness will recant statements" before a court may call a witness as its own.
 {¶ 28} Ohio Rule of Evidence 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The decision whether or not to call individuals as witnesses of the court is left to the "sound discretion" of the trial court. State v. Adams (1980),62 Ohio St.2d 151, paragraph four of the syllabus. "The term `abuse of discretion' connotes more than an error or law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." State v. Apanovitch (1987), 33 Ohio St.3d 19,22, citing Adams, 62 Ohio St.2d at 157.
 {¶ 29} It is well-established that a trial court does not abuse its discretion in calling a witness as a court's witness when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement made to police. See Adams, 62 Ohio St.2d at 158; State v. Sealey,
11th Dist. No. 2002-L-100, 2003-Ohio-6697, at ¶ 31; State v.Reynolds, 5th Dist. No. 2002CA00177, 2003-Ohio-1107, at ¶ 20;State v. Chavis, 10th Dist. Nos. 01AP-1456 and 01AP-1466, 2003-Ohio-512, at ¶ 41; State v. Davis (Dec. 10, 1993), 11th Dist. No. 92-L-089, 1993 Ohio App. LEXIS 5917, at *8-*10; Statev. Dacons (1982), 5 Ohio App.3d 112, 114.
 {¶ 30} In the present case, prior to trial, the State moved to have King declared an unavailable witness for the purposes of having her written statement to police admitted into evidence as a statement against interest under Evid. R. 804(B)(3). After voir diring the Lake County Prosecutor's Office's chief investigator, the court declared King an unavailable witness. At this point, Schultz's counsel moved the trial court for a continuance to allow him to attempt to procure King's presence. Schultz's counsel had previously represented King on prostitution charges arising from the same events as Schultz's current charges. Moreover, Schultz had posted King's appellate bond in that prior case. Schultz's counsel informed the court that he believed King would recant her statement made to police by saying that she was under the influence of heroin and that she was coerced by police. The trial court initially denied the motion for a continuance but granted it after Schultz waived his right to a jury trial.
 {¶ 31} We find nothing unreasonable, arbitrary, or unconscionable about the trial court's decision to call King as a court's witness. King's testimony was essential to determining the truth of the charges against Schultz. Defense counsel had indicated to the court that he believed King would contradict her prior statement made to the police that clearly implicated Schultz in promoting prostitution. In these circumstances, a trial court is justified in calling the witness as a court's witness in order to allow the prosecution an opportunity to cross-examine the witness about her prior inconsistent statement.
 {¶ 32} On this issue, courts have repeatedly rejected Schultz's argument that having a witness called as a court's witness impermissibly circumvents Evid. R. 607(A)'s restrictions on the impeachment of one's own witness. E.g. Adams,62 Ohio St.2d 157-158; Dacons, 5 Ohio App.3d at 114. This court, in particular, has held that when a witness is called pursuant to Evid. R. 614(A), Evid. R. 607(A) has no application. Sealey,2003-Ohio-6697, at ¶ 30; Davis, 1993 Ohio App. LEXIS 5917, at *7-*8, citing Apanovitch, 33 Ohio St.3d at 22.
 {¶ 33} Schultz's third assignment of error is without merit.
 {¶ 34} In Schultz's second assignment of error, he argues that the trial court erred by admitting King's written statement to the police after King appeared and testified that this statement was not true.
 {¶ 35} Pursuant to Evid. R. 613(B), "[e]xtrinsic evidence of a prior inconsistent statement by a witness is admissible * * * [i]f the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement * * * [and] [t]he subject matter of the statement is * * * [a] fact * * * of consequence to the determination of the action." As with a trial court's decision to call witnesses, a trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. State v. Finnerty
(1989), 45 Ohio St.3d 104, 107.
 {¶ 36} In the present case, the State met all the foundational requirements for the admission of King's prior written statement to police. See State v. Mack,73 Ohio St.3d 502, 514-515, 1995-Ohio-273. The subject matter of the statement was Schultz's role in King's action of performing a sexual act in exchange for money. Prior to the statement's admission into evidence, King was given a copy of her statement and an opportunity to review it. King confirmed that it was the statement she gave to police on the morning of August 20, 2002. King then endeavored to explain, under cross-examination by both parties, that the statement was inaccurate for a variety of reasons: she was coerced by police; she was high on drugs; she incriminated Schultz because the police had lied to her. King also admitted that the substance of the statement was true, but that it was true in respect of "Steve" rather than Schultz.
 {¶ 37} On appeal, Schultz argues at length that King's statement was inadmissible under Evid. R. 801(D) providing that, in certain circumstances, a witness's prior statements do not constitute hearsay and, therefore, may be admitted as substantive evidence. Schultz has failed to demonstrate, however, that the trial court admitted the statement as substantive evidence under Evid. R. 801(D), rather than for impeachment purposes under Evid. R. 613(B). In the absence of such demonstration, a reviewing court is compelled to presume that the lower court, acting as the trier of fact, only considered properly admitted evidence. Statev. Coombs (1985), 18 Ohio St.3d 123, 125 ("A reviewing court must presume that the trial court applied the law correctly.");State v. Eubank (1979), 60 Ohio St.2d 183, 187 ("[A] judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record."); Columbus v. Guthmann
(1963), 175 Ohio St. 282, paragraph three of the syllabus ("In the absence of some showing to the contrary, there is a presumption that a trial judge performed his duty and did not rely upon anything in reaching his decision that he should not have relied upon.").
 {¶ 38} Schultz's second assignment of error is without merit.
 {¶ 39} In the fourth and final assignment of error, Schultz challenges the sufficiency of the evidence to support his convictions for promoting prostitution and possession of criminal tools. Crim. R. 29(A) (a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction"). In order to convict Schultz of promoting prostitution, the State was required to show that Schultz "knowingly * * * [s]upervise[d], manage[d], or control[led] the activities of a prostitute in engaging in sexual activity for hire." R.C. 2907.22(A)(2). To convict Schultz of possessing criminal tools, the State was required to show that Schultz held one of the cell phones in his possession "with purpose to use it criminally." R.C. 2923.24.
 {¶ 40} The Ohio Supreme Court has defined "sufficiency" as "a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, quoting, Black's Law Dictionary (6 Ed. 1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307, 319.
 {¶ 41} Schultz argues that the State failed to prove that King was a prostitute; that any sexual contact between Johnson and King was initiated by Johnson; and that the whole affair was a private transaction between Johnson and King. We disagree. A "prostitute" is defined as "a male or female who promiscuously engages in sexual activity for hire, regardless of whether the hire is paid to the prostitute or to another." R.C. 2907.01(D). Since King willingly engaged in "sexual activity"[3] with Johnson at Johnson's suggestion in exchange for one hundred and sixty dollars, she is a prostitute. It is irrelevant whether Johnson or King brought up the subject of sex.
 {¶ 42} We also find the evidence sufficient to demonstrate that Schultz supervised, managed, or controlled King's activities in engaging in sexual activity for hire. It is undisputed that Johnson called two numbers from the Cleveland yellow pages to arrange for "an escort" and that both these numbers were the same numbers on the hundred business cards found in Schultz's car and on the business card found in King's purse, which also had Schultz's cell phone number written on it. When the police tried one of the numbers on the business cards, it rang one of Schultz's cell phones. Johnson testified that the same unidentified man answered the phone both times and that he arranged with this man for a girl for one hundred and fifty-five dollars an hour. Telephone records submitted by the State show that, between 11:30 pm and 12:30 am on the night in question, phone calls were made from Johnson's room at the Red Roof Inn to Schultz's cell phone and from Schultz's cell phone to the Johnson's room at the Red Roof Inn. Schultz drove King to the hotel to meet Johnson and Schultz was expected to pick King up again afterwards. King was identified in Schultz's notebook of female names and descriptions. King testified that when she would have sex with someone, she would give Schultz sixty dollars; although King also testified that Schultz was only holding this money for Steve. This evidence discredits Schultz's contention that the whole affair was a private transaction between Johnson and King and King's testimony that Schultz's role was only that of driver.
 {¶ 43} Viewing the evidence in a light most favorable to the prosecution, we hold that the State presented evidence legally sufficient and of substantial weight to prove, beyond a reasonable doubt, that King supervised the activities of a prostitute and that the cell phones in his possession were used to further this criminal purpose. Schultz's fourth assignment of error is without merit.
 {¶ 44} For the foregoing reasons, the decision of the Lake County Court of Common Pleas is affirmed.
Rice, J., concurs,
[1] The parties dispute whether Schultz's license was, in fact, under suspension at the time of the stop. We agree with the trial court that this question is irrelevant for the purpose of evaluating the propriety of the stop and seizure. The LEADS printout indicated that Schultz's license was suspended. Regardless of whether this was true or not, Davis was entitled to rely on the report for probable cause to arrest Schultz. See, e.g. State v. Freeman, 11th Dist. No. 2001-T-0008, 2002-Ohio-1176, at ¶ 15 ("When [the officer] had determined, through the L.E.A.D.S. report, that appellant's driving privileges had been suspended, he had reasonably trustworthy information that appellant was in the process of committing the offense of driving with a suspended license.").
[2] The dissent argues that, at the time of the search, Schultz "was secured in the police car" and, therefore, posed no threat to police officers or to potential evidence. As the Supreme Court in Belton recognized, "under this fallacious theory no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to his `exclusive control.'" 453 U.S. at 461 n. 5. Moreover, the fact that cell phones or business cards are not illegal is irrelevant. The items seized provided the police with probable cause to investigate further, if not probable cause to arrest Schultz for promoting prostitution.
[3] "Sexual activity" is defined as "sexual conduct or sexual contact." R.C. 2907.01(C). "Sexual conduct," in turn, is defined to include "fellatio," which describes the sexual act engaged in by Johnson and King.