[Cite as *State v. Pittman*, 2022-Ohio-300.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | |
|---|---|
| STATE OF OHIO, | : |
| Plaintiff-Appellee, | : |
| | No. 110272 |
| v. | : |
| CALVIN PITTMAN, JR., | : |
| Defendant-Appellant. | : |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 3, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-640250-C

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, LLC, Joseph C. Patituce, Megan M. Patituce, and Catherine Meehan, *for appellant.*

MARY EILEEN KILBANE, J.:

**{¶ 1}** Defendant-appellant, Calvin Pittman, Jr., appeals from his convictions, rendered after a bench trial, for numerous crimes relative to the fatal shooting of victim Albert Crenshaw. He was one of five defendants charged in a ten-count indictment; Pittman's codefendants were Katelyn Reed, Micaela Durand,

Jaquan Ransom, and Roderick Stewart.[1]  For the reasons set forth below, we affirm the convictions and sentence.

**Procedural History**

{¶ 2}    Relative to Pittman, the charges were as follows:  Count 1, aggravated murder, with one- and three-year firearm specifications; Count 2, aggravated robbery, with one- and three-year firearm specifications as well as a notice of prior conviction and a repeat violent offender specification; Count 3, aggravated robbery, with one- and three-year firearm specifications as well as a notice of prior conviction and a repeat violent offender specification; Count 4, aggravated murder, with one- and three-year firearm specifications; Count 5, murder, with one- and three-year firearm specifications; Count 6, felonious assault, with one- and three-year firearm specifications as well as a notice of prior conviction and a repeat violent offender specification; Count 7, felonious assault, with one- and three-year firearm specifications as well as a notice of prior conviction and a repeat violent offender specification; and Counts 8 and 9, having a weapon while under a disability.[2]

{¶ 3}    Pittman executed a waiver of his right to a jury trial, and the matter was set for trial to begin on November 2, 2020.  One of the codefendants, Durand, provided the state with a statement, pled guilty in March 2020, and as part of her

---

[1] With the exception of Roderick Stewart, the codefendants have also filed appeals, which are pending as companion cases.  *See State v. Reed*, 8th Dist. Cuyahoga No. 110217, *State v. Durand*, 8th Dist. Cuyahoga No. 110232, and *State v. Ransom*, 8th Dist. Cuyahoga No. 110271.

[2] Count 10 did not charge Pittman; it was relative to codefendant Ransom only.

plea agreement, was to testify against Pittman. On the day prior to the scheduled trial, November 1, Pittman's counsel filed a motion to continue the trial on the ground that the defense had received items in discovery from the state that needed to be reviewed. The trial court held a hearing on the motion.

{¶ 4} At the hearing, the assistant prosecuting attorney informed the court that codefendant Durand's mother had been subpoenaed for the trial date, and she called the assistant prosecuting attorney when she received the subpoena. Durand's mother told the assistant prosecuting attorney that Durand told her (the mother) that she (codefendant Durand) had lied during her proffer. Durand told her mother that Durand's lawyers told Durand she better say what codefendant Reed (who had also provided a statement to the state) had said if she wanted a plea bargain in her own case. The assistant prosecutor informed Pittman's counsel of the substance of the call. The assistant prosecuting attorney then obtained and listened to the jail call where codefendant Durand told her mother she lied during the proffer. This was the information given to the defense ahead of the November 2, 2020 trial date. During the hearing, the assistant prosecutor told the court that based on this new evidence, the state could not put Durand on the witness stand without her being called as a court's witness. At the conclusion of the hearing, the trial court granted Pittman's motion for a continuance, and trial was reset for November 30, 2020.

**Trial Testimony**

**{¶ 5}** Pittman's bench trial went forward on November 30, 2020, at which the following facts were adduced.[3]

**Background**

**{¶ 6}** Shortly before midnight on April 9, 2019, Crenshaw was fatally shot while he was in his vehicle on a parking lot behind an apartment building on Fortune Avenue in Cleveland, where codefendant Stewart lived. After being shot, Crenshaw maneuvered his vehicle onto the street before crashing into two parked cars approximately two houses away from the apartment building. Two witnesses who lived on Fortune Avenue, mother and daughter Lisa and Tiara Rosa, testified to what they heard and saw that evening.

**{¶ 7}** Specifically, the Rosas testified that they had heard a car crash and then saw two men, each with a gun in his hand, run up to the car that had just crashed. According to the Rosas, one of the males had on a gray "hoodie" and the other wore a red "hoodie." The Rosas saw one of the men reach into the car, take something, and then both males ran off in the direction of the apartment building at the end of the street. Tiara called 911; her 911 call was played in court. Tiara told dispatch that she saw two people shooting — one male on the driver side and the

---

[3] Pittman's case was tried alone, because his codefendants all entered into plea agreements with the state, which included them testifying truthfully against Pittman. *See State v. Durand*, C.P. No. CR-19-640250-A, *State v. Reed*, C.P. No. CR-19-640250-B, *State v. Stewart*, C.P. No. CR-19-640250-D, and *State v. Ransom*, C.P. No. CR-19-640250-E.

other male on the passenger side. Near the end of the call, Tiara, a nursing student, went to the car to see if she could help, but the driver was "slunched" over in the seat and did not have a pulse.

{¶ 8} Tiara identified Crenshaw's car as the car she approached that evening. She testified that it had been just outside of and across the street from her house. Both Rosas spoke with the police when they arrived on the scene. They maintained that they saw both men run up to the car and both were firing guns. Lisa explained her certainty about both males having guns: "they both had guns out, and you could see the fire, the light, because it was dark outside." The Rosas also testified that the two men ran past their house twice — once on their way to the car and then again as they ran away from the car.

{¶ 9} Sergeant Christopher Mobley of the Cleveland Police Department was one of the responding officers; he was wearing a body camera. He identified state's exhibit No. 234, which was a screenshot from his body camera showing the way victim Crenshaw was when he first arrived — slumped in the crashed car, dead from gunshot wounds. Sgt. Mobley testified that officers had recovered two spent shell casings and a bullet from the parking lot of the apartment building and multiple shell cases from an alleyway by the parking lot. The officers also recovered another shell casing and spent bullet near Crenshaw's vehicle. No gun was recovered at that time.

{¶ 10} After the homicide, codefendant Ransom was arrested and jailed on an unrelated matter. While in jail, he made a call from a jail phone to his girlfriend,

Jessica Lindley, during which he told Lindley "to hide the gun because whoever gets caught with it will do life." After the jail call from Ransom to Lindley, the police searched Lindley's house and a 9 mm gun was recovered.

**Forensic Evidence**

{¶ 11} Dr. David Dolinak, a deputy medical examiner for Cuyahoga County, performed the autopsy of victim Crenshaw. According to Dr. Dolinak, Crenshaw suffered three separate gunshot injuries; one was to his left arm and two were to the left side of his chest. Dr. Dolinak testified that the bullet to the arm went through the left arm without hitting the bone. Regarding the two wounds to the chest, one went through Crenshaw's left lung and heart and then through the right armpit, where it was lodged and recovered; the other went through Crenshaw's left lung, backbone, and exited his back. Dr. Dolinak testified that, given the positioning of the arm to the chest, all three injuries could be explained with two bullets, with one shot going through Crenshaw's arm and into his chest and the second shot going into the chest. According to the deputy medical examiner, Crenshaw had cocaine, alcohol, and a muscle relaxer drug in his system, but none of those substances alone or together were the cause of his death. Dr. Dolinak found that Crenshaw's cause of death was the gunshot wounds and his manner of death was homicide.

{¶ 12} Kristen Koeth, a ballistics expert with the Cuyahoga County Regional Forensic Science Laboratory, performed ballistic testing in this case and testified at trial as to the results. Specifically, Koeth tested the bullet recovered from

Crenshaw's body during the autopsy, the two spent casings from the apartment parking lot, two damaged bullets, and the 9 mm gun retrieved from Lindley's house.

{¶ 13} With regard to the gun, Koeth testified that the gun was submitted with a barrel that was not the original manufacturer's barrel. The barrel that was on the gun when it was submitted still allowed the gun to fire properly, however. Koeth testified that the three bullets she had (the one from autopsy and the two damaged ones) were all 9 mm caliber bullets. One of the damaged bullets was too damaged to say anything about it other than its caliber. Koeth determined that the other two bullets were fired by the same unknown 9 mm handgun.

{¶ 14} With regard to the two spent casings and the 9 mm handgun that was submitted, Koeth was able to determine that the two spent casings were fired by the submitted gun, but that that same gun did not fire either the bullet recovered during the autopsy or the other 9 mm bullet.

{¶ 15} Daniel Mabel, a trace evidence expert from the Cuyahoga County Regional Forensic Science Laboratory, performed the trace evidence testing in this case. Mabel determined the approximate muzzle-to-target distance between the shooter and the bullet defects in Crenshaw's sweatshirt to be four feet.

{¶ 16} Carey Baucher, a DNA expert from the Cuyahoga County Regional Forensic Science Laboratory, performed the DNA testing in this case. She testified as to the following findings: (1) Durand's DNA was in the fingernail scrapings from Crenshaw's right hand; (2) Ransom's DNA was in the swabs of the grip and trigger of the recovered 9 mm gun; (3) Ransom's DNA was in the swabs of the slide and

barrel of the recovered 9 mm gun; and (4) Ransom's DNA was in the swabs of the magazine of the recovered 9 mm gun.

**Codefendants' Testimonies**

**Roderick Stewart**

**{¶ 17}** Codefendant Stewart testified as part of a plea agreement with the state. As mentioned, at the time of the homicide he was living in the subject apartment building. Stewart testified that he knew codefendants Reed and Durand, as well as Pittman.[4] At the time, Pittman and Durand were dating; they had a child together. Stewart also knew codefendant Ransom though Pittman.

**{¶ 18}** On the evening of the homicide, Reed was at Stewart's apartment and she received a phone call from Durand saying she had a "lead." The lead was that they were supposed to hang out with "a guy" that night, get some drugs from him, and "hit a lick" so that they would have money for Reed's birthday. According to Stewart, "hit a lick" means "selling" your body in exchange for drugs and/or money.

**{¶ 19}** Later, Durand, Pittman, and Ransom came over to Stewart's apartment. Reed and Durand left the apartment with "the guy," and Pittman and Ransom stayed behind at his apartment. Stewart testified that Pittman and Ransom were waiting for their ride to come; they were there for about two hours. At one

---

[4] Reed was the sister of the mother of Stewart's child. She used to live with her sister, but she (Reed) and Stewart began having a romantic relationship, and the sister made her leave. After that, Reed frequently stayed for extended periods of time at Stewart's one-bedroom apartment. Stewart lived at the apartment with his mother and two young daughters.

point, Stewart told Pittman and Ransom that they had to leave because his children were there at the apartment and his mother was coming home. Pittman and Ransom complied and went to the apartment complex's laundry room, which was in the back of the building. Stewart testified that the laundry room is a "kick it," or hang out place. Pittman and Ransom were in the laundry room for about an hour; at one point, they came to his apartment asking for a phone charger because one of their cell phones had died.

{¶ 20} At some point, Stewart heard three gunshots and a car crash. Stewart further testified that then he had seen Ransom and Pittman running around to the back entrance of the apartment building, and they then came up to his apartment. Ransom told Stewart that while he reached into the car, he shot the man in the head. According to Stewart, Pittman and Ransom were "panicky," looking out the window, whispering to each other, and went into the bathroom together.

{¶ 21} Thereafter, Stewart's mother arrived home, and she gave Pittman and Ransom a ride to another location. Reed and Durand came back to the apartment. They were "panicky" too. Reed said she thought they just robbed somebody, and Durand said the "dude got shot in the chest and then she jumped out of the car." Stewart testified that at one point Durand told him that Ransom shot Crenshaw in the chest, but later she said she did not know who shot him because Ransom and Pittman were wearing masks.

**Jaquan Ransom**

{¶ 22} Ransom testified that he knew Durand and Pittman, who were dating each other. He also knew Reed, but did not know Stewart. According to Ransom, he, Reed, Durand, and Pittman were together at Lindley's (his girlfriend) house and began talking about a robbery. He and Pittman discussed setting up a guy to rob for his money. Pittman said it would be an easy robbery and no one would get hurt. Ransom told Pittman they should use his (Ransom's) 9 mm gun during the robbery. Ransom testified that he bought the gun at a gun show earlier in the year and denied ever altering it after he bought it.

{¶ 23} After the discussion, Durand and Reed met up with victim Crenshaw and rode to the west side of Cleveland with him, while he and Pittman rode to the same location in a different car. At the location, they went into an apartment (i.e., Stewart's apartment); Pittman apparently knew Stewart, because Pittman and Stewart gave each other a "brotherly hug." Pittman was communicating via cell phone with Durand, and Durand was telling him that Crenshaw was on his way to the location. Once Crenshaw pulled into the parking lot in the back of the apartment building, Ransom and Pittman pretended like they were taking out the trash and robbed Crenshaw. According to Ransom, he was wearing a gray "hoodie" and Pittman was dressed in all black.

{¶ 24} According to Ransom, at that time, only he had a gun, and he held the gun on Crenshaw while Pittman searched his pockets. Crenshaw tried to pull off in his car and that was when Ransom fired four shots at Crenshaw, hitting him twice.

Ransom testified that he and Pittman chased down the car and looked inside; Pittman found a gun in the car and took it. Ransom testified that Pittman was on the driver's side of the car when he, Pittman, reached in and found Crenshaw's gun and that Pittman fired it at Crenshaw. Ransom testified that in addition to taking Crenshaw's gun, they also took $2,000 and jewelry from Crenshaw. Ransom further testified that as he and Pittman ran away from the scene, Pittman fired two shots from the gun he took from Crenshaw. He testified that he and Pittman were the only two with guns at the scene at that time.

{¶ 25} The above testimony was elicited from Ransom on direct examination. On cross-examination, Ransom admitted that he had not been truthful. Specifically, Ransom admitted that he lied about Pittman's involvement in the crime so as to deflect his own involvement. He continued to deny altering the gun, however. He also testified that Pittman came up with the idea of robbing someone. Further, when Ransom was questioned about whether two guns were used as opposed to just his own gun, Ransom admitted that he was making that up in the hope of avoiding a life sentence.

{¶ 26} On redirect examination, the assistant prosecutor questioned Ransom about what parts of his story he had been making up on the stand. Ransom replied "everything." Ransom was then reminded of his plea agreement, under which he agreed to testify truthfully, and when questioned as to whether he satisfied that portion of his agreement he replied, "no." Ransom explained that he was afraid of what Pittman might do to him.

{¶ 27} The assistant prosecuting attorney then requested permission to call Ransom as a court's witness under Evid.R. 614 on the ground that Ransom had just admitted to violating his plea agreement; the defense objected. The trial court granted the state's request.

{¶ 28} Under cross-examination by the state, Ransom testified that he, not Pittman, shot and killed Crenshaw. However, Pittman was "the backup man" for the robbery; Pittman went through Crenshaw's pockets while Ransom held the gun on him. The sum of Ransom's testimony on the state's cross-examination was that it was Pittman's idea to rob Crenshaw, Ransom had the gun, Pittman never touched the gun, and Ransom was the only one who fired the gun. Ransom was unable to provide an explanation for why the bullets recovered from the scene and from Crenshaw's body did not match his gun. He again denied ever switching the barrel on his gun either before or after the crime and maintained that his gun was the only gun used during the crime.

**Katelyn Reed**

{¶ 29} Codefendant Reed testified that on the night of the crimes, she was hanging out with Durand, and Ransom and Pittman were also present. At some point, Durand told the group that Crenshaw had a lot of money and drugs and the plan was hatched that Ransom and Pittman would rob Crenshaw.

{¶ 30} Reed testified that she did not see any guns and was not aware that guns would be used. She went along with the plan because Durand was her friend. The plan involved Reed and Durand first going out to a bar with Crenshaw, which

they did.  Surveillance camera captured Reed, Durand, and Crenshaw at the bar. After having a few drinks and using cocaine, the three of them left the bar and went to Crenshaw's house.

{¶ 31} Reed testified that she had used more drugs at Crenshaw's house while Durand had gone into a room with Crenshaw and later came out of the room saying that Crenshaw had tried to rape her and she wanted to go to Stewart's apartment.  Crenshaw then drove the two women to Stewart's apartment.  When they arrived at Stewart's apartment, Crenshaw drove to the rear of the parking lot, where Reed got out of the car and went to Stewart's apartment.  A short time later, Durand came up to Stewart's apartment distraught, panicking, and crying and told Reed that Ransom shot Crenshaw.

{¶ 32} Four days later, on April 13, 2019, Reed and Durand were hanging out when they encountered Pittman and Ransom.  According to Reed, Pittman and Ransom told her she "better keep quiet" or they would kill her.  Durand also told Reed not to talk to the police.

{¶ 33} All of Reed's testimony was elicited on direct examination by the state; the defense did not cross-examine her.

**Micaela Durand**

{¶ 34} Prior to codefendant Durand taking the stand, the state requested that the trial court call her as a court's witness pursuant to Evid.R. 614 for the reason it previously mentioned at the hearing on the defense's motion for a continuance. Specifically, the assistant prosecuting attorney told the trial court that Durand made

a proffer statement to the police, wherein she and her attorney signed a letter stating that she understood she was required to tell the truth during the statement and, if given a plea deal, she would be required to tell the truth under oath, as needed by the state, during the trials of her codefendants. After signing the statement, Durand gave a video-recorded statement. The state then offered her a plea agreement, and Durand pleaded guilty for her part in the crimes.

{¶ 35} However, prior to the within trial, Durand sent the court a letter saying she wished to withdraw her plea because she did not want to serve time for the three-year firearm specification to which she had pled guilty to. The trial court denied her motion. Durand filed another motion to withdraw her guilty plea, and in this motion she stated that she had lied in the video-recorded statement in order to get a favorable plea deal from the state. The trial court granted the state's motion and called Durand as a court's witness.

{¶ 36} As mentioned, Durand and Pittman were dating each other at the relevant time. According to Durand's testimony, before the crimes giving rise to this case, she and Pittman had lost some money and drugs in Stewart's car. She knew that Crenshaw had both money and drugs so she "hit him up" for both. On the evening of the within incident, she and Reed discussed meeting up with Crenshaw to steal drugs and money from him. She denied that this discussion was about a robbery that Pittman and Ransom "were going to do," like she said in her proffer statement, however.

**{¶ 37}** Durand testified that she texted revealing pictures of herself to Crenshaw prior to him picking up her and Reed. Crenshaw picked her and Reed up, they went to a bar for a while, and then Crenshaw took them to his house. She testified that he wanted to have sex with her, but she did not want to, so he took them back to Stewart's apartment.

**{¶ 38}** Durand admitted that she was texting with Pittman while she was out with Crenshaw, and that prior to arriving at Stewart's apartment, she texted Pittman that they were on their way. When they arrived at Stewart's apartment building, she and Reed got out of Crenshaw's car and went to Stewart's apartment, but she left and went back to Crenshaw's car and got in. After she was back in Crenshaw's car, Ransom walked up to the car and put a gun to Crenshaw's face. According to Durand, Ransom was alone at this time and shot Crenshaw as she was still in the front passenger seat; Pittman was not there. Durand testified that she got out and ran to the apartment building, and Pittman then ran out toward Ransom and Crenshaw's moving car.

**{¶ 39}** According to Durand, Ransom and Pittman could have discussed robbing Crenshaw outside her presence but she did not know if that happened. She admitted that it looked like Ransom and Pittman were robbing Crenshaw, however. Further, she could not say that Pittman did not shoot Crenshaw, because she was not out there to see who fired at him after the car crashed.

**{¶ 40}** In regard to why her trial testimony was different from her statement, Durand testified that her lawyer played statements for her and told her she better

sound like that in order to get a plea deal.  She testified that she lied in the statement to implicate Pittman in the robbery and shooting because she wanted a plea deal so she could go home to her kids instead of doing life in prison.

**Verdict, Sentence, Assignments of Error**

**{¶ 41}**  At the conclusion of the trial, the court found Pittman guilty of all the charges against him with the exception of Count 4, aggravated murder.  The trial court sentenced Pittman to life with parole eligibility after 30 years, in addition to six years for the firearm specifications.[5]  Pittman now appeals, raising the following four assignments of error:

> Assignment of Error 1:  Appellant's conviction was against the manifest weight of the evidence.
>
> Assignment of Error 2:  The State failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.
>
> Assignment of Error 3:  The trial court abused its discretion when it called Micaela Durand and Jaquan Ransom as court witnesses.
>
> Assignment of Error 4: The trial court erred in sentencing Appellant to a life term in prison with the possibility of parole after thirty years.

**Law and Analysis**

**Manifest Weight of the Evidence**

---

[5] The trial court sentenced Pittman under the Reagan-Tokes Act on Count 2.  The defense did not object at the sentencing hearing, and the Act is not an issue here on appeal.

**{¶ 42}** In his first assignment of error, Pittman contends that his convictions were against the manifest weight of the evidence and asks us to remand the case for a new trial.

**{¶ 43}** "[A] manifest weight challenge questions whether the state met its burden of persuasion." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 44}** Pittman contends in this assignment of error that the "main evidence that [he] was involved in the planning of Mr. Crenshaw's murder came from Jaquan Ransom, who was an admitted liar and who was, in fact, the person who shot and killed Mr. Crenshaw." Pittman also challenges the inconsistencies in the other codefendants' testimonies about whether Pittman was in on the plan to rob Crenshaw.

**{¶ 45}** We note that in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Thus, in reviewing criminal manifest-weight-of-the-evidence challenges, appellate courts must be mindful of the presumption in favor of the finder of fact, and defer to the fact-finder's resolution of conflicting testimony if the greater amount of credible evidence supports the verdict. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶ 46} Upon review, the conviction was not against the weight of the evidence. It is true that there were some inconsistencies in the testimonies involving Pittman's involvement in planning the robbery. For example, Stewart, Durand, and Reed's versions of the events seemed to indicate that Reed and Durand planned the robbery on their own, without input from Pittman. But when the record is viewed as a whole, it supports the trial court's finding that Pittman was involved in the planning and execution of the crimes.

{¶ 47} By the account of all of the codefendants, Pittman and Ransom were together on the evening of the murder. Although Stewart testified that he never heard the two discuss robbing Crenshaw, Pittman and Ransom stayed in either his apartment or the building laundry room for hours while Reed and Durand were out with Crenshaw. After Stewart heard gunshots, he then saw both Pittman and Ransom run to the back entrance of his apartment building; they both came back into his apartment. Ransom said that he had shot a man, and both Ransom and Pittman were "panicky." Further, codefendant Reed testified that she, Durand,

Ransom, and Pittman were all involved in the plan to rob Crenshaw. Reed was not cross-examined by the defense and, therefore, her testimony was uncontroverted.

{¶ 48} The two neutral witnesses in this case, Tiara and Lisa Rosa, testified that they heard a car crash, and then saw two men approach the car with guns in their hands, fire at the car, reach into the car and take something, and then run away. The testimony of those involved in these crimes only related to three males: Ransom, Pittman, and Stewart. The only place any of the witnesses ever put Stewart was inside his own apartment. The Rosas, who had no motive whatsoever to lie, were certain in their testimony that they saw two males shooting; that would leave only Ransom and Pittman. Tiara told it to the 911 dispatcher, and they both told it to the police on the scene.

{¶ 49} Although there were inconsistencies in the codefendants' testimonies, when the record is considered in its totality, the record shows more than Pittman being "in the wrong place at the wrong time," as he contends. Rather, it shows that Pittman was right along with Ransom (and Durand and Reed) in planning and executing the robbery.

{¶ 50} We also find that this was not the exceptional case in regard to the evidence concerning whether Pittman had a gun. The neutral eyewitnesses, the Rosas, both testified that they saw both men with guns. Further, the forensic evidence showed that the two spent casings recovered from the scene were fired from Ransom's gun, but the two 9 mm bullets recovered from the scene were not.

**{¶ 51}** In light of the above, Pittman's convictions were not against the manifest of the evidence. The first assignment of error is overruled.

**Sufficiency of the Evidence**

**{¶ 52}** In his second assignment of error, Pittman contends that the evidence was insufficient to support the convictions. We disagree.

**{¶ 53}** Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the state has met its burden of production at trial is conducted. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *Thompkins*, 78 Ohio St.3d 380, at 390, 678 N.E.2d 541. An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

**{¶ 54}** To the extent that Pittman raises issues with his codefendants' credibility in this assignment of error, we note that credibility is not a consideration

for us under a sufficiency-of-the-evidence review. *State v. Metz*, 2019-Ohio-4054, 146 N.E.3d 1190, ¶ 58 (8th Dist.), citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. It bears repeating that under a sufficiency review, the question is whether the evidence, if believed, is sufficient to support the contested elements. *Yarbrough* at *id.* In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *See Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). The state produced sufficient testimony to support the convictions in this case.

**{¶ 55}** It is undisputed that Crenshaw was shot to death. The Rosas, who were neutral witnesses in this case, testified that they saw two males, each with guns, run up on the car Crenshaw was in, both shooting, and one reaching into the car and taking something. The forensic evidence supported the use of two guns. Direct and circumstantial evidence demonstrated that Pittman and Ransom were the two shooting. "When offering proof, both circumstantial and direct evidence have the same probative value, and in some instances, certain facts can be established only by circumstantial evidence." *State v. Crowe*, 12th Dist. Warren No. CA2015-07-065, 2016-Ohio-1579, ¶ 19, citing *State v. Crutchfield*, 12th Dist. Warren No. CA2005-11-121, 2006-Ohio-6549, ¶ 20; *see also State v. Hopfer*, 112 Ohio App.3d 521, 558, 679 N.E.2d 321 (2d Dist.1996) (stating that "circumstantial evidence is sufficient to prove the essential elements in a criminal case.") Codefendant Reed — whose testimony went unchallenged — testified that Pittman and Ransom had a plan (which she was a part of too) to rob Crenshaw. In sum, the state presented sufficient

evidence that Pittman acted alongside Ransom with the same purpose. The second assignment of error is therefore overruled.

**Durand and Ransom as Court Witnesses**

{¶ 56} The third assignment of error challenges the trial court's decision granting the state's request to call codefendants Durand and Ransom as court witnesses.

{¶ 57} Evid.R. 614(A) provides, in relevant part, "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." Pursuant to Evid.R. 611 and 614, a trial court has discretion to control the flow of the trial, including questioning of witnesses, "in a search for the truth." *State v. Redon*, 8th Dist. Cuyahoga No. 92611, 2009-Ohio-5966, ¶ 8. "Evid.R. 614(A) exists to bring about the proper determination of a case. A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18.

{¶ 58} The trial court's decision to treat a witness as a court's witness, rather than a witness of the state's, is entirely within the trial court's discretion, and this court will not reverse the trial court's decision absent an abuse of that discretion. *Parma Hts. v. Owca*, 2017-Ohio-179, 77 N.E.3d 505, ¶ 35 (8th Dist.), citing *State v. Stadmire*, 8th Dist. Cuyahoga No. 81188, 2003-Ohio-873, ¶ 26; *State v. Davis*, 79 Ohio App.3d 450, 454, 607 N.E.2d 543 (4th Dist.1992). "The court's power to call a

witness pursuant to Evid.R. 614(A) is inherent, and should be exercised in fulfillment of the court's fundamental obligation to assist in arriving at the truth." *State v. Brown*, 11th Dist. Lake No. 2014-L-032, 2015-Ohio-950, ¶15, citing *State v. Davis*, 11th Dist. Lake No. 92-L-089, 1993 Ohio App. LEXIS 5917 (Dec. 10, 1993), citing Evid.R. 614(A), Staff Notes.

**{¶ 59}** In requesting that Ransom and Durand be called as the court's witness, the state referred to *State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659. *Crawford*, like this case, involved a bench trial on charges of aggravated murder and aggravated robbery and the trial court permitting a state's witness to be converted to the court's witness during the witness's testimony after it became apparent that the witness was not going to abide by his plea agreement to testify truthfully and consistent with a prior statement he had made.

**{¶ 60}** This court upheld the trial court's decision on appeal. This court found that although the state was surprised by the witness's testimony, and therefore had satisfied the requirement under Evid.R. 607(A),[6] which would have allowed the state to impeach its witness, the trial court was nonetheless within its discretion to call the witness as a court's witness. The *Crawford* Court specifically noted that "Evid.R. 614 authorizes the court to call a witness whom a party might otherwise call on the party's 'suggestion' that the witness would then recant another

---

[6] Evid.R. 607(A) provides in relevant part that "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

prior statement favorable to that party." *Id.* at ¶ 53, citing *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218 (2d Dist.), ¶ 43, citing *State v. Kizer*, 6th Dist. Sandusky No. S-03-028, 2005-Ohio-2491.

{¶ 61} The *Crawford* Court further held that when a trial court calls a witness, it does so regardless of the surprise required by Evid.R. 607(A). *Id.* at ¶ 54, citing *Arnold* at *id.*, and *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987). Moreover, a trial court "does not abuse its discretion in calling a witness as a court's witness 'when the witness's testimony would be beneficial to ascertaining the truth of the matter and there is some indication that the witness's trial testimony will contradict a prior statement.'" *Arnold* at ¶ 44, quoting *State v. Schultz*, 11th Dist. Lake No. 2003-L-156, 2005-Ohio-345, 29; *see also Crawford* at ¶ 55.

{¶ 62} In light of the above, the trial court did not abuse its discretion in calling Ransom and Durand as the court's witnesses. The court found that both witnesses had testimony that would be beneficial in the search for the truth, and the record supported that finding. The third assignment of error is overruled.

**Life Sentence with Possibility of Parole after 30 Years**

{¶ 63} In his final assignment of error, Pittman contends that his sentence constitutes cruel and unusual punishment for crimes he maintains he did not commit. We disagree.

{¶ 64} Initially, we note that the Supreme Court of Ohio has recently clarified in *State v. Patrick*, 164 Ohio St.3d 309, 2020-Ohio-6803, 172 N.E.3d 952, that R.C. 2953.08(D)(3) does not preclude an appeal of a sentence for a murder or an

aggravated-murder offense that is based on constitutional grounds.  *Id.* at ¶ 22. The court explained that R.C. 2953.02 also provides a statutory right to appeal a sentence to the court of appeals.  *Id.* at ¶ 16.

{¶ 65}  The Eighth Amendment to the United States Constitution applies to the states pursuant to the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).  The amendment provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Section 9, Article I of the Ohio Constitution sets forth the same restriction:  "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted."

{¶ 66}  '"The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 13, quoting *State v. Weitbrecht*, 86 Ohio St.3d 368, 373, 715 N.E.2d 167 (1999), quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).

{¶ 67}  Here, Pittman was sentenced within the statutory range for each of the convictions.  None of the sentences were ordered to run consecutively with each other, and he did not receive a maximum sentence on any one particular count. On this record, his argument that his sentence was unsupported by the record is without merit.  The fourth assignment of error is overruled.

**{¶ 68}** Having overruled all of Pittman's assignments of error, his convictions and sentences are affirmed.

**{¶ 69}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
LISA B. FORBES, J., CONCUR