[Cite as *State v. Macklin*, 2022-Ohio-4400.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,              :

                                             No. 111117

    v.                                   :

DIMITRIUS MACKLIN,                       :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** December 8, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652974-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, John Kirkland and Kevin R. Filiatraut, Assistant
Prosecuting Attorneys, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and
Francis Cavallo, Assistant Public Defender, *for appellant*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant, Dimitrius Macklin ("Macklin"), appeals his convictions following a jury trial. For the reasons set forth below, we affirm in part, vacate Macklin's conviction for conspiracy, and remand for further proceedings.

## Procedural and Factual History

{¶ 2} On August 3, 2017, officers from the Cleveland Police Department ("CPD") responded to Macomb Avenue after dispatch received a 911 call reporting a shooting. On arrival, the officers found an individual, who was later identified as Hesham Kamel ("Kamel"), on the ground bleeding from gunshot wounds. At the time, Kamel was conscious and speaking with a resident of Macomb Avenue who had witnessed some of the incident and had come to his aid. The officers administered first aid then had EMS transport Kamel to MetroHealth Hospital ("Metro"), where he succumbed to his injuries.[1]

{¶ 3} While still at the scene, the officers learned that Kamel had traveled to Macomb Avenue from Lake County to trade his car ("the Suzuki"). The officers learned that Kamel had traveled to that location based on communications he had been having with unknown individuals on an online marketplace. Once Kamel arrived, he was carjacked and subsequently shot. The following day, police officers recovered Kamel's abandoned Suzuki along with his wallet and driver's license.

{¶ 4} To be detailed below, forensic testing of the interior of the Suzuki revealed the DNA of several different individuals. Following an investigation spanning more than two years, CPD filed charges against Macklin, along with

---

[1] An autopsy performed by the Cuyahoga County Medical Examiner's Office determined that Kamel suffered two perforated gunshot wounds. One wound was to the left side of the chest, wherein the bullet entered through the seventh rib, before passing through the liver and right kidney, then exited through the right side of Kamel's back. The other wound was to Kamel's right hand, with the bullet entering the base of his pinky finger, fracturing the base of that bone, then exiting the palm by the middle finger.

codefendants Richard Lee Glass, Jr. ("Glass"), Michael Butler ("Butler"), and Prophet Beverly ("Beverly") (collectively "codefendants"), with aggravated murder, murder, aggravated robbery, felonious assault, and having weapons while under disability ("HWWUD").

{¶ 5} Macklin was 17 years old at the time Kamel was carjacked and fatally shot. The Cuyahoga County prosecutor (the "Prosecutor") sought to have him bound over to the general division of the court of common pleas ("adult court"). In August 2020, the juvenile court conducted a probable-cause hearing and found no probable cause for the charges of aggravated murder and HWWUD. The juvenile court found probable cause for the charges of murder, aggravated robbery, and felonious assault and bound Macklin over to adult court.

{¶ 6} Subsequently, on September 21, 2020, a grand jury returned an 11-count indictment against Macklin and his codefendants. The charges were comprised of one count of aggravated murder, one count of murder, two counts of aggravated robbery, four counts of conspiracy to commit aggravated robbery, one count of felonious assault, and two counts of tampering with evidence. One- and three-year firearm specifications were attached to the first nine counts.

{¶ 7} In addition, the four counts of conspiracy alleged that Macklin and his codefendants "did undertake substantive overt acts, to wit: * * * planned to commit an aggravated robbery of an unknown person through the use of an online scheme to lure the unknown person to a location, separate from the location where the scheme to lure was created and implemented."

{¶ 8} Macklin pleaded not guilty to the charges at the arraignment, and after numerous pretrial conferences, the matter proceeded to a jury trial.

## Jury Trial

{¶ 9} At the trial, 54-year-old Andrew Kozar ("Kozar") testified that he had lived on Macomb Avenue for approximately 25 years. Kozar testified that on August 3, 2017, shortly after arriving home from work, he was starting up the grill to cook dinner on his back porch when he heard what sounded like a firecracker or possibly gunfire. Kozar then heard a man yelling in pain, which prompted him to walk through the house to his front porch, where Kozar saw two men standing in the street next to a car.

{¶ 10} Kozar testified that the man standing in the middle of the street, appeared to be pleading with the other man, who shot the pleading man point blank in the chest. Kozar said he could not hear what was being said but could tell that the man who had been shot was pleading with the assailant, because he was holding his chest with one hand and his other arm was outstretched with the palm facing out. Kozar testified that after the assailant sped away in a silver car, he ran out to the street to assist the man, trying to contain the bleeding and keeping him conscious until EMS arrived. The victim, who was attempting to dial his phone, asked Kozar to place the call to his wife.

{¶ 11} Kozar testified that he had three surveillance cameras, two mounted outside that captured footage from the driveway and garage, and the third mounted inside his home office. Kozar testified that later that evening, he reviewed the

surveillance tapes and discovered that they contained video footage that could be used to identify the car. Kozar contacted CPD, who came and retrieved the footage.[2]

{¶ 12} Kamel's son, Ebraam Kamel ("Ebraam"), testified that he and his immediate family were born in Egypt and that they moved to Cleveland, Ohio, in 2012. Ebraam testified that on August 3, 2017, he was in Westlake when he received a telephone call from his sister, who was hysterically instructing him to go to Metro immediately, because their father was in the hospital. After arriving at Metro and learning that his father was on the operating table, Ebraam proceeded to look through various computer accounts that he helped his father establish. Ebraam explained that because his father was not tech-savvy and was not fluent in the English language, his father relied on him for setting up the accounts. As a result, Ebraam had the passwords to his father's Facebook, Offer Up, and Marketplace accounts.

{¶ 13} Ebraam testified that after reviewing the above accounts, and in particular Offer Up, he discovered several messages, which revealed that his father was planning on trading a vehicle. Ebraam shared this information with CPD, who later showed him a picture of the Suzuki. Ebraam testified that although the picture was blurry, he was able to identify the Suzuki because the back bumper had a piece missing.

---

[2] The video was played during Kozar's testimony.

**Investigation Testimony**

{¶ 14} Detective Timothy Cramer ("Detective Cramer), who was a patrolman at the time of the shooting, testified that he and his partner responded to the scene. On arrival, Detective Cramer found the scene chaotic, with several people trying to help Kamel, who was going in and out of consciousness. Detective Cramer tried to restrict the bleeding but stated that, based on his experience, he did not think survival was promising.

{¶ 15} Detective Cramer testified that after EMS left with Kamel, the officers turned their attention to the crime scene, where they observed broken glass and recovered two spent shell casings nearby, which indicated that the victim was shot at close range.[3] Detective Cramer testified that they were able to review video footage captured by surveillance cameras mounted on a resident's home. The video footage depicted a silver Suzuki Aero driving away eastbound on Macomb Avenue. Detective Cramer testified that he later went to Metro and learned from Ebraam that the Suzuki had been stolen, so CPD began looking for a stolen vehicle. Detective Cramer testified that CPD recovered the Suzuki the following day.

{¶ 16} CPD crime-scene detective, Darren Robinson ("Detective Robinson"), testified that he processed the Suzuki. Detective Robinson explained that the process generally includes photographing the vehicle, as well as collecting DNA, fingerprints, blood samples, and gunshot residue. Detective Robinson

---

[3] Trace testing at the Cuyahoga County Regional Forensic Laboratory determined that both shell casings were fired from the same .40-caliber firearm.

testified that he swabbed the Suzuki's steering wheel and gearshift, as well as the interior and exterior of all the doors to obtain DNA. Additionally, Detective Robinson swabbed a Garmin GPS device that was found in the Suzuki for DNA.

{¶ 17} Detective Robinson testified that he also dusted the Suzuki for fingerprints. Specifically, he dusted the Suzuki's interior, including the rear-view mirror, as well as the exterior, paying close attention to the door handles and windows. Detective Robinson testified that he developed a total of five sets of fingerprints after dusting the Suzuki. Detective Robinson testified that he normally swabs for DNA prior to dusting for fingerprints, so that there is no contamination of evidence. Detective Robinson testified that he secured all the items and forwarded them to the laboratory for testing.

{¶ 18} Detective David Borden ("Detective Borden"), the original homicide investigator, testified that shortly after Kamel's death, CPD obtained surveillance video from several locations along the route the assailants took after leaving the scene. Detective Borden testified that he later obtained records from Offer Up that revealed communications between Kamel and an account holder identified as "Rob Turbo." Detective Borden testified that by utilizing the IP address associated with the Rob Turbo account, CPD was able to obtain a physical address, which led CPD to obtain email addresses and phone numbers of Glass and Butler.

{¶ 19} Detective Borden testified that subsequently, through a confidential informant, CPD was able to gather Facebook and Instagram information that led to CPD acquiring information about Macklin and Beverly. Detective Borden testified

that CPD also obtained Macklin's cell phone number and records, which included location data. Detective Borden testified that ultimately, due to his heavy caseload, he turned over the investigation to Federal Bureau of Investigation ("FBI") Special Agent Andrew Burke ("Special Agent Burke").

{¶ 20} Special Agent Burke[4] testified that around July 2019, he obtained a copy of the paper file and digital evidence from Detective Borden regarding CPD's investigation. Special Agent Burke testified that one of the first things he did was review Macklin's phone records and those of another suspect.[5] Special Agent Burke's review indicated that Macklin and Butler were communicating during the timeframe that Kamel was killed, which led him to secure a warrant to obtain Macklin's DNA. Special Agent Burke subsequently obtained DNA samples from all three codefendants.

{¶ 21} Special Agent Burke testified that as the investigation progressed, he "collected numerous digital records that included location information," such as phone, cellular tower, and GPS information from the portable unit in the Suzuki. Special Agent Burke forwarded the above information to FBI Special Agent Jacob Kunkle ("Special Agent Kunkle") for detailed analysis.

---

[4] Special Agent Burke is a 15-year veteran of the FBI and, for the past four years, has been assigned to CPD Homicide Unit as part of the Violent Crime Task Force.

[5] The individual was ultimately eliminated as a suspect.

{¶ 22} Special Agent Kunkle testified that he was part of a group of specially trained agents in the Cellular Analysis Survey Team Unit ("CAST Unit").[6] Special Agent Kunkle testified that members of the CAST Unit specialize in historical location analysis of records generated by cellular phones or other devices. Specifically, the CAST Unit analyzes cellular records to examine where devices were located during the timeframes that alleged criminal activities occurred.

{¶ 23} Special Agent Kunkle testified that he conducted an historical location analysis of the cellular records for August 3, 2017, the date Kamel was fatally shot. Special Agent Kunkle explained that he utilized cellular records provided by CPD to map the location of two devices at the relevant times, based on the devices' relationship to the cellular towers in the vicinity of the crime scene. Special Agent Kunkle testified that his analysis indicated, to a reasonable degree of scientific certainty, that the cellular phones belonging to Macklin and Butler were in the vicinity of Macomb Avenue at the time of the homicide. Special Agent Kunkle testified that the two cellular phones were also in the vicinity of Beverly's house located on East 108th Street.

---

[6] Special Agent Kunkle is a 13-year veteran with the FBI, he is one of the approximately 80 members nationwide of the CAST Unit, and he has testified as an expert witness on historical location analysis in approximately 60 trials.

**Forensic Testimony**

{¶ 24} DNA Analyst Lisa Moore ("Moore"),[7] from the Cuyahoga County Regional Forensic Science Laboratory, testified that she performed DNA analysis relevant to Kamel's homicide. Moore explained that her analysis spanned several stages, based on when the laboratory received the evidence. As a result, Moore authored four related reports, including an initial report and three supplemental reports.

{¶ 25} Moore testified that her first report, generated in January 2018, involved the single-source testing of Kamel's DNA, which was the only reference sample the laboratory had at that point. Moore analyzed DNA obtained from blood samples at the crime scene and from various parts of the Suzuki. Moore testified that Kamel's DNA was found in a blood splatter on the street at the crime scene, blood on the windshield, as well as swabs of the driver's door, left rear door handles, the steering wheel, the gearshift, and the portable GPS device.

{¶ 26} Moore testified that in August 2019, the laboratory received Macklin's buccal swabs. Moore explained that she generated a DNA profile specific to Macklin, which was later compared to the DNA profile detailed in the original report. Moore testified that Macklin's DNA matched a portion of the same mixture containing Kamel's DNA. Specifically, Macklin's DNA was present in the swabs taken from both the steering wheel and the gearshift of the Suzuki Aero. Moore testified that

---

[7] Moore has been a DNA analyst for more than 20 years and has testified as an expert more than 135 times.

64-67 percent of the mixture from the swabs of the steering wheel and the gearshift belonged to Kamel, while 13-19 percent of the mixture belonged to Macklin. Moore explained that because Kamel had been the Suzuki's owner, it was expected that his DNA would be more prominent when compared to Macklin's who had presumedly driven the Suzuki for a short time.

{¶ 27} Moore testified that in October 2019, the laboratory received Beverly's buccal swabs. Moore testified that after generating and analyzing the profile, Beverly's DNA was found in the mixture of DNA found in the swab of the Suzuki's rear passenger door handle. Moore testified that in February 2020, the laboratory received the buccal swabs of Butler and Glass. Moore testified that after analysis, Butler's DNA was found in the mixture of DNA found in the swab of the Suzuki's front passenger door handle. Moore testified that due to insufficient genetic information, the statistical match was inconclusive in relation to Glass.

**Codefendants' Testimony**

{¶ 28} At the trial, the codefendants testified pursuant to respective plea agreements with the Prosecutor. Glass, who is the brother of Beverly, testified that on August 3, 2017, he, Beverly, Butler, and Macklin were sitting around his house "chilling."[8] According to Glass, at some point, Butler began talking about needing to get some money. All four left for a while, traveled to Garfield Heights, picked up

---

[8] The Urban Dictionary defines "chilling" as doing nothing that requires effort.

food along the way, and then returned to the house. Later, they all walked to a nearby street, where the events leading to Kamel's death unfolded.

{¶ 29} Glass testified that once at the location, Butler told them someone was about to arrive shortly. When the individual drove up, everyone except for Glass approached with the intention to commit a robbery. The individual resisted and attempted to grab Macklin, who then fired a shot into the ground. Glass immediately ran and heard a second gunshot as he was running away.

{¶ 30} Moments later, Macklin, Butler, and Beverly pulled around the corner in the Suzuki and Glass entered the back passenger compartment. Glass testified that Macklin was driving the Suzuki but could not recall who was in the front passenger seat or who was seated with him in the back passenger compartment. Glass stated that when they reached Miles Avenue, he and Beverly exited the Suzuki, and Macklin drove away with Butler.

{¶ 31} Glass claimed that he had attempted to deescalate the situation. The following exchange ensued:

Q. * * * Defense counsel asked you about whoever was doing the robbery. Who was doing the robbery?

A. It was Meech,[9] everybody, for real.

Q. Who had the gun when you saw it fired the first time?

A. Meech.

Q. When you ran away, did you hear another shot fired?

---

[9] The codefendants referred to Macklin by the nickname "Meech."

A. Yes.

Q. Do you know who fired that shot?

A. No.

Q. Who was the last person holding that gun before you ran away?

A. Meech.

{¶ 32} Beverly, like his brother Glass, testified that all four were at his house chilling on August 3, 2017. According to Beverly, at some point he was told that they were going to meet somebody about trading a car and that he was needed as a "look out." All four went to an abandoned house, but the individual they were planning to meet went to a different street. Macklin and Butler quickly went to meet the individual, while he and Glass followed behind.

{¶ 33} Beverly testified that, as he reached a little way up the street, he heard gunshots and saw a body on the ground in the middle of the street, then saw Macklin and Butler getting into the Suzuki. Beverly and Glass ran, jumped over a fence, and ended up on another street. Macklin drove up in the Suzuki with Butler in the front passenger seat. Beverly and his brother entered the back passenger's compartment.

{¶ 34} Beverly testified that he heard two gunshots but did not see when the individual was shot. Beverly testified that he had seen Macklin with a gun before they left to meet the individual about trading a car but claimed that the shooting was not part of anybody's plan. The following exchange took place:

Q. Okay. Do you know who fired the shots at this man?

A. Yes.

Q. Who fired the shots at this man?

A. Meech.

Q. And how do you know that?

A. Because [Butler] didn't have a gun.

Q. Okay. Who were the two people up there nearer to the man?

A. [Butler] and Meech.

{¶ 35} Butler testified that on August 3, 2017, Macklin, Beverly, and Glass persuaded him to take part in a robbery. Butler stated they needed money to assist his older brother, who had recently been shot. According to Butler, Beverly assisted him in creating the account on Offer Up, using the name "Rob Turbo." Butler explained that he used his Gmail account to verify his identity but used photographs of a random black person and a random Nissan automobile to represent himself and the vehicle he was pretending to sell. After setting up the fictitious account, Butler, Beverly, and Glass began communication with prospective buyers on both the Offer Up and Text Now platforms. Soon they had interest from an individual who wanted to trade his car plus additional cash for the fictitious car they had listed on Offer Up.

{¶ 36} Butler testified that they all walked towards East 86th Street and Vineyard Avenue to meet the individual. He approached the individual and informed him that the car was around the corner on Macomb Avenue. Butler testified that once they arrived on Macomb Avenue, Macklin approached the man and began to frisk him, but the man began to resist. Macklin fired a shot, which blew

off a part of the man's finger.  Macklin then entered the Suzuki and fired a second shot through the driver's window, which struck the man in his chest.

{¶ 37} Butler testified that everyone fled except Macklin, who got behind the wheel of the Suzuki.  Macklin picked them up on Warner Road and drove a short distance to a dead-end street, where they all proceeded to wipe down the Suzuki.  Butler testified that Macklin wiped down the Suzuki's steering wheel, gearshift, and driver's door; Beverly wiped down the left rear passenger door; Glass wiped down the right rear passenger door; and he wiped down the front passenger seat and door.

**Verdict and Sentence**

{¶ 38} On November 4, 2021, the jury found Macklin not guilty of Count 1, aggravated murder; guilty of Count 2, murder, along with the one-year firearm specification; guilty of Count 3, aggravated robbery, along with the one-year firearm specification; not guilty of Count 4, aggravated robbery; guilty of Count 8, conspiracy, along with the one-year and three-year firearm specifications; and guilty of Count 9, felonious assault, along with the one-year firearm specification.

{¶ 39} On November 16, 2021, Macklin appeared for sentencing.  After the merger of Counts 3 and 8 into Count 2, the trial court sentenced Macklin to one year on the firearm specification in Count 2, to be served prior to and consecutive to 15 years to life on the base charge of murder.  The trial court also sentenced Macklin to one year on the firearm specification in Count 9, to be served prior to eight years on the base charge of felonious assault.  Additionally, the trial court ordered Macklin to

serve the sentence in Count 9 consecutive to the sentence in Count 2, for an aggregate prison term of 25 years to life.

{¶ 40} Macklin now appeals and assigns the following errors for review:

## Assignment of Error No. 1

The court of common pleas general division erred by proceeding to trial upon an indictment for which it lacked jurisdiction on counts that were not bound over by the juvenile court.

## Assignment of Error No. 2

There was insufficient evidence produced at trial to support a finding of guilt on all counts.

## Assignment of Error No. 3

The jury verdict was against the manifest weight of the evidence.

## Law and Analysis

**Subject-Matter Jurisdiction**

{¶ 41} In the first assignment of error, Macklin argues the trial court lacked jurisdiction on counts that were not bound over by the juvenile court.

{¶ 42} Preliminarily, we note "[j]urisdiction is defined as a court's statutory or constitutional power to adjudicate a case." *State ex rel. Frett v. Sutula*, 8th Dist. Cuyahoga No. 101983, 2015-Ohio-21, ¶ 4, citing *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992. "The term encompasses jurisdiction over the subject matter and over the person." *Pratts* at ¶ 11, citing *State v. Parker*, 95 Ohio St.3d 524, 2002-Ohio-2833, 769 N.E.2d 846, ¶ 22. "It is a 'condition precedent to the court's ability to hear the case. If a court acts without jurisdiction, then any proclamation by that court is void.'" *Id.*, quoting *State ex rel. Tubbs Jones v. Suster*,

84 Ohio St.3d 70, 701 N.E.2d 1002 (1998). We review decisions on subject-matter jurisdiction de novo. *State ex rel. Ohio Civ. Serv. Emps. Assn v. State*, 146 Ohio St.3d 315, 2016-Ohio-478, 56 N.E.3d 913, ¶ 12.

{¶ 43} In the instant matter, relying on the Ohio Supreme Court's recent opinion in *State v. Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297,[10] Macklin argues the adult court had no jurisdiction over counts, including the most serious charge of aggravated murder, for which the juvenile court found no probable cause. Macklin's reliance on *Smith* is well-placed.

{¶ 44} Briefly, in *Smith*, the Ohio Supreme Court clarified that a "probable cause [finding] is a jurisdictional prerequisite under R.C. 2151.12 to transferring a child to adult court for prosecution of an act charged." *Id*. at ¶ 44. Absent a probable cause finding by the juvenile court, an adult court lacks subject-matter jurisdiction to convict a child. *Id*. at ¶ 42. A transfer "confers jurisdiction to adjudicate only the acts charged for which probable cause has been found by the juvenile court." *Id*. at ¶ 26.

---

[10] In *Smith*, a complaint filed in the juvenile court charged the allegedly delinquent child with acts that, if he were an adult, would have constituted eight felonies. *Id*. at ¶ 3. The juvenile court held a bindover hearing and found probable cause existed for two counts of aggravated robbery and one count of grand theft. *Id*. at ¶ 9. While these counts included firearm specifications in the complaint, the juvenile court found no probable cause to believe that the acts were committed with a firearm. *Id*. Furthermore, the court found no probable cause for the theft, failure-to-comply, and possessing-a-weapon-while-under-disability counts. *Id*. at ¶ 10. In adult court, the state charged Smith with nine felonies, including the charges for which the juvenile court had found no probable cause. *Id*. at ¶ 12. Smith pleaded guilty to aggravated robbery with a firearm specification, grand theft, failure to comply, and escape. *Id*. at ¶ 13. The Ohio Supreme Court held that the adult court lacked jurisdiction over the counts and specifications "for which no probable cause has been found by a juvenile court." *Id*. at ¶ 42.

**{¶ 45}** Therefore, the scope of an adult court's jurisdiction over a child is "limited to the acts that the juvenile court found were supported by probable cause." *Id.* When a juvenile court makes a probable cause finding and subsequently transfers jurisdiction to the adult court, the transfer "does not open the door to prosecution in adult court for any charge the state might later seek in an indictment." *Id.* at ¶ 2. Consequently, in this case, the clear import of *Smith* is that the adult court lacked jurisdiction over the charge of aggravated murder, which the juvenile court found no probable cause. The adult court also lacked jurisdiction over the charge of conspiracy, which the state added after the juvenile court conducted the probable cause hearing.

**{¶ 46}** Nonetheless, the state counters that Macklin's reliance on *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, is misplaced. Instead, the state argues R.C. 2152.02(C)(5) is applicable under the circumstances of this case. R.C. 2152.02(C)(5) provides as follows:

> Any person whose case is transferred for criminal prosecution pursuant to section 2152.12 of the Revised Code and who subsequently is convicted of or pleads guilty to a felony in that case, unless a serious youthful offender dispositional sentence is imposed on the child for that offense under division (B)(2) or (3) of section 2152.121 of the Revised Code and the adult portion of that sentence is not invoked pursuant to section 2152.14 of the Revised Code, and any person who is adjudicated a delinquent child for the commission of an act, who has a serious youthful offender dispositional sentence imposed for the act pursuant to section 2152.13 of the Revised Code, and whose adult portion of the dispositional sentence is invoked pursuant to section 2152.14 of the Revised Code, shall be deemed after the conviction, plea, or invocation not to be a child in any case in which a complaint is filed against the person.

*Id.*

{¶ 47} Relying on R.C. 2152.02(C)(5), the state offers that although Macklin was 17 years old at the time of the charged offenses, Macklin (1) had already been found guilty of several felonies in two separate cases and, (2) was serving adult prison sentences for those felonies by the time he was indicted in 2019 on the charges relating to the present matter. *See* Cuyahoga C.P. Nos. CR-18-629985 and CR-18-630759.[11]

{¶ 48} On this basis, the state urges that under R.C. 2152.02(C)(5), Macklin was no longer deemed a "child" and the juvenile court should have immediately transferred the case to adult court without conducting a probable-cause hearing. Thus, the state maintains it was not precluded from proceeding against Macklin on all charges true-billed by the grand jury. However, the state has overlooked a critical requirement embodied in the statute on which it relies.

{¶ 49} Pivotally, the state has ignored the fact that the two separate cases being deployed to undergird its argument were never transferred from the juvenile court for criminal prosecution pursuant to R.C. 2152.12. Instead, the record reveals these cases flowed from offenses committed in April and June of 2018, after Macklin had reached the age of 18. As a result, the two cases did not involve transfers from juvenile court to the common pleas, but directly indicted into the common pleas court.

---

[11] On September 20, 2018, Macklin was sentenced to concurrent prison terms of 36 months following convictions for two counts of HWWUD and a single count of tampering with evidence.

{¶ 50} Critically, because Macklin's adult cases did not involve a transfer from the juvenile court to the common pleas court, they cannot serve as the predicate to extinguish Macklin's classification as a juvenile in the instant matter. To underscore, a "transfer extinguishes a juvenile's classification as a child in any case in which a complaint is filed against the individual once the juvenile is convicted of or pleads guilty to a felony in the transferred case." *State v. Jones*, 2022-Ohio-1169, 188 N.E. 3d 280, ¶ 54 (8th Dist.).

{¶ 51} Consequently, R.C. 2152.02(C)(5) is inapplicable to the instant matter. As such, the juvenile court was never divested of its subject-matter jurisdiction under R.C. 2151.23(A) to resolve the criminal charges against Macklin, nor stripped of its province to exercise judicial discretion in determining whether there was probable cause to believe that Macklin committed the criminal acts. By extension, and on the authority of *Smith*, the common pleas court's jurisdiction was limited to the charges where the juvenile court found probable cause.

{¶ 52} Based on the foregoing discussion, Macklin should not have been brought to trial on the additional counts of aggravated murder and conspiracy.

{¶ 53} As stated previously, the jury acquitted Macklin of aggravated murder. However, he argues herein that the specter of a trial on that charge served to taint the jury. We reject this assertion. Arguably, the acquittal on the charge of aggravated murder is an indication that the jury was able to decipher the evidence presented.

{¶ 54} Accordingly, we sustain the first assignment of error and vacate Macklin's conviction for conspiracy.

**Sufficiency of Evidence**

{¶ 55} In the second assignment of error, Macklin argues that his convictions were not supported by sufficient evidence.

{¶ 56} Preliminarily, we note, Crim.R. 29(A) provides that a court

> "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a Crim.R. 29 motion questions the sufficiency of the evidence," [w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence."

*State v. Scott*, 8th Dist. Cuyahoga No. 110691, 2022-Ohio-1669, ¶ 36, quoting *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 57} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 58} The jury convicted Macklin of the following remaining offenses at issue in this assignment of error:

1. Felony murder. Pursuant to R.C. 2903.02(B), felony murder is defined as "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a [certain] felony of the first or second degree * * *."

2. Aggravated robbery. Pursuant to R.C. 2911.01(A)(3), aggravated robbery is a first-degree felony and defined in part as "No person, in attempting or committing a theft offense * * * shall * * * [i]nflict, or attempt to inflict, serious physical harm on another."

3. Felonious assault. Pursuant to R.C. 2903.11(A)(1), felonious assault is defined in part as "No person shall knowingly * * * [c]ause serious physical harm to another * * *."

4. One-year firearm specification. Pursuant to R.C. 2941.141(A), a one-year firearm specification is applicable to a conviction, in pertinent part, when "the offender had a firearm on or about the offender's person * * * while committing the offense."

5. Three-year firearm specification. Pursuant to R.C. 2941.145(A), a three-year firearm specification is applicable to a conviction, in pertinent part, when "the offender had a firearm on or about the offender's person * * * while committing the offense and * * * used it to facilitate the offense."

{¶ 59} With the above standard in mind, we now address Macklin's contention that there was no independent eyewitness account, but only testimony of his codefendants. Macklin also contends that the DNA evidence was not conclusive.

{¶ 60} Initially, to the extent that Macklin attacks his codefendants' credibility within this assignment of error, we note that credibility is not a consideration for us under a sufficiency of the evidence review. *State v. Pittman*,

8th Dist. Cuyahoga No. 110272, 2022-Ohio-300, ¶ 54, citing *State v. Metz*, 2019-Ohio-4054, 146 N.E.3d 1190, ¶ 58 (8th Dist.), citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. It bears repeating that under a sufficiency review, the question is whether the evidence, if believed, is sufficient to support the contested elements. *Yarbrough* at *id*. In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Id.*, citing *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).

{¶ 61} In this matter, Kozar, an eyewitness, testified that he saw an assailant shoot Kamel point blank in the chest and then speed away in the Suzuki. Video footage from surveillance cameras mounted on Kozar's residence depicted the Suzuki speeding away from the scene of the crime. Furthermore, pursuant to the autopsy report, Kamel suffered another gunshot wound to his right hand with the bullet entering the base of his pinky.

{¶ 62} Historical location analysis of digital records revealed that the cellular phones belonging to Macklin and Butler were being used in the vicinity of Macomb Avenue at the time of the homicide. The location analysis also revealed that both cellular phones were being used in the vicinity of Beverly's home on East 108th Street on the morning of August 3, 2017. Additionally, the codefendants' testimony corroborated that Macklin conspired to commit aggravated robbery on August 3, 2017.

{¶ 63} Also, when the Suzuki was recovered, CPD developed a total of five sets of fingerprints after dusting the vehicle. The fingerprints belonged to the victim

and the four perpetrators. Additionally, the DNA collected placed Macklin and his codefendants in the Suzuki. Not only did it place them in the Suzuki, but it also placed each in the very location where testimony indicated each was seated. Specifically, the DNA placed Macklin behind the steering wheel, Butler in the front passenger seat, and Beverly and Glass in the rear passenger compartment. Critically, Macklin's DNA was found on the steering wheel and gearshift, which corroborated testimony of the codefendants that Macklin drove the Suzuki away from the scene.

{¶ 64} Although Macklin raises an issue with the amount of DNA, it is undisputed that his DNA was present in the Suzuki. Further, of the four who hatched the plan resulting in Kamel's death, Macklin's was the only DNA found on the Suzuki's steering wheel and gearshift. Moore testified that 64-67 percent of the mixture from the swabs of the steering wheel and gearshift belonged to Kamel, while 13-19 percent belonged to Macklin. Moore explained that this proportion would be expected because Kamel was the owner and drove the Suzuki all the time, while Macklin had only driven it for a short time.

{¶ 65} We conclude the above evidence, if believed, was sufficient to support Macklin's convictions.

{¶ 66} Accordingly, we overrule the second assignment of error.

**Manifest Weight of Evidence**

{¶ 67} In the third assignment of error, Macklin argues that his convictions were against the manifest weight of the evidence.

{¶ 68} Unlike sufficiency, "'weight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins*, 78 Ohio St.3d at 380, 678 N.E.2d 541. Weight of the evidence relates to "'the evidence's effect of inducing belief.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. The reviewing court must consider all of the evidence in the record, the reasonable inferences to make from it, and the credibility of the witnesses to determine ""whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.""" *Harris* at *id.*, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 69} To begin, we note Macklin redeploys the arguments from the second assignment of error to attack the credibility of his codefendants and the level of DNA evidence. Macklin devotes significant energy attacking the credibility of his codefendants who, as a condition of their separate plea agreements with the state, agreed to testify truthfully on behalf of the state.

{¶ 70} As a sidenote, this court has previously stated that "'when an accomplice testifies on behalf of the state in exchange for a plea agreement, there is a possibility the accomplice's testimony may be self-serving and biased.'" *State v. Gray*, 8th Dist. Cuyahoga No. 90981, 2009-Ohio-1782, ¶ 54, quoting *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158 (8th Dist.). Thus, under

R.C. 2923.03(D), trial courts are required to give a special jury instruction[12] in situations where there is some evidence of complicity and an accomplice testifies against the defendant. *Id.* at ¶ 55, citing *State v. Moritz*, 63 Ohio St.2d 150, 407 N.E.2d 1268 (1980). A review of the record reveals the trial court instructed the jury in compliance with R.C. 2923.03(D).

{¶ 71} As discussed in the preceding assignment of error, the state presented evidence which, if believed, was sufficient to support Macklin's convictions. Here, although the details in each codefendants' testimony varied, all three testified that Macklin was the shooter. Arguably, codefendant Butler summed it up neatly as follows:

Q. Who fired that second gunshot?

A. [Macklin].

Q. Did you see him do it?

A. Yes.

Q. Was this thing planned?

A. The shooting, no, it was not planned.

Q. How about any other part?

A. Every other part was planned out.

---

[12] "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require that it be weighed with great caution. It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶ 72} Upon review, we find that the weight of the evidence supports the jury's verdict. Furthermore, the evidence shows that Macklin and the codefendants stole the Suzuki after shooting Kamel in the chest and hand, resulting in Kamel's death. Thus, despite Macklin's present contentions, nothing in our review indicates that the jury clearly lost its way and created a manifest miscarriage of justice in finding him guilty.

{¶ 73} Accordingly, we overrule the third assignment of error.

{¶ 74} Judgment affirmed in part, vacated in part, and remanded for further proceedings.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, P.J., and
LISA B. FORBES, J., CONCUR